9 F.3d 109
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Marta J. OSIMOWICZ, Plaintiff-Appellant,
v.
FORD MOTOR COMPANY, Defendant-Appellee.
 No. 92-1886.
 United States Court of Appeals, Sixth Circuit.
 Nov. 2, 1993.
 
 Before: MILBURN, RYAN, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Marta Osimowicz appeals the district court's grant of summary judgment in favor of defendant Ford Motor Company. Specifically, she alleges error with regard to the court's disposal of the following claims: (1) breach of contract (counts I and XI of her First Amended Complaint), (2) violation of the Michigan Bullard-Plawecki Employee Right to Know Act (count III), and (3) violation of the Employee Retirement Income Security Act (ERISA), specifically 29 U.S.C. Sec. 1021 (count IX) and 29 U.S.C. Sec. 1140 (count X). For the reasons that follow, we affirm.
 
 
 2
 * Plaintiff Marta Osimowicz had worked for Ford Motor Company ("Ford") for over sixteen years. She began as an hourly worker and was eventually promoted to the salaried position of production supervisor. She was a participant in Ford's employee benefit plan, which was self-administered by Ford's Employee Relations Staff.
 
 
 3
 On February 24, 1990, Osimowicz's husband unexpectedly died. She took a bereavement leave and a medical leave for depression during the following months. On August 15, 1990, she returned to work, and although she was not subject to any medical restrictions at the time, Ford placed Osimowicz on several consecutive temporary assignments to help her ease back into the work environment. After a few months, Ford told Osimowicz that because of economic conditions, they needed her back at her job as production supervisor. She was reluctant to return to such a position because of the stress involved in supervising the production laborers at the plant, and she petitioned several managers and supervisors to place her somewhere else. Ford informed her that she could return to hourly status at one of Ford's other plants if she wanted to. But after thinking about it and hearing that the other plant was laying off workers, she declined Ford's offer.
 
 
 4
 Because of the impact of her husband's death, Osimowicz had begun seeing a licensed psychotherapist, Julie Blom. Blom has an M.S.W. degree. Dr. Schornstein (M.D.) is the medical director of the clinic where Blom works, and while Blom was the primary therapist, Schornstein saw Osimowicz personally on two occasions before her termination, once in April 1990 and once, at the request of Blom, on January 16, 1991. Blom had seen Osimowicz begin to recover from her depression, but then saw the depression return when Osimowicz began anticipating her return to her position as production supervisor. Blom wondered if medication would be appropriate, so she asked Schornstein to meet with Osimowicz. At that time, Dr. Schornstein prescribed Prozac for Osimowicz, and Blom wrote a letter to Ford, which was countersigned by Schornstein, saying, "It is our belief that Ms. Osimowicz is not able at this time to meet the demands of her previous position as Production Supervisor."
 
 
 5
 Dr. Jones, Ford's plant physician, was in charge of making determinations as to an employee's medical disability and ability to return to work. Because of Osimowicz's extended period of leave immediately following her husband's death and because of Jones's doubts about the severity of Osimowicz's condition, Dr. Jones asked Osimowicz to meet with a third-party evaluator,[1] Dr. Wallace, to get another psychologist's opinion of Osimowicz's ability to perform her job as production supervisor. On January 26, Osimowicz met with Dr. Wallace. Wallace informed Ford that her initial opinion was that Osimowicz was capable of doing her job as production supervisor.
 
 
 6
 On January 28, 1991, Osimowicz returned to her job as production supervisor, but only worked for three days. On February 2, she visited Dr. Wallace for further evaluation. On February 4, Osimowicz returned to work because she knew the production line would not be running. One of Osimowicz's supervisors, Paul Temple, called her in to his office and asked Osimowicz if it was her intention only to report to work if the production line was not running. Osimowicz replied, "Paul, I don't know. I can't say I'm going to be here if the line is running."
 
 
 7
 On February 8, Osimowicz met with John Corrigan, then the salary personnel supervisor, to confirm what she had heard from others: she would not be permitted to take another medical leave. Corrigan said that he himself would never say Osimowicz could not go on medical leave, but that the third-party evaluator (Dr. Wallace) had said Osimowicz could do her job and for that reason she would not be permitted to take additional medical leave. Osimowicz surreptitiously recorded this conversation.
 
 
 8
 On February 11, Osimowicz met with Dr. Jones. Jones told Osimowicz that Wallace believed that she could do her job as production supervisor. Jones then inquired as to whether Osimowicz was willing to continue to work as a production supervisor. Osimowicz testified at her deposition, "I believe I said, 'I can't do it right now, I can't do this job right now.' " (Osimowicz surreptitiously recorded this conversation as well.) Osimowicz reported to work again on February 13, while the production line was shutdown, but never reported to work after that time because, in her words, she had "had it."
 
 
 9
 On February 15, Osimowicz visited Blom again, and this meeting prompted Blom to write another letter to Dr. Jones. In the letter, Blom wrote that "[i]t is our belief that Ms. Osimowicz should be on medical leave effective immediately due to her extreme depression, suicidal and homocidal [sic] thoughts she is experiencing, and an inability to function normally in daily activities.... We believe it would be dangerous for her to return to work in this severe state of depression." When Dr. Jones received this letter, she was very concerned and contacted Blom directly. Jones asked Blom why, if Osimowicz was in such a bad condition, Blom did not have Osimowicz hospitalized. Blom said that was "under consideration."
 
 
 10
 On February 16, Osimowicz had her last visit with Dr. Wallace. Osimowicz surreptitiously tape recorded this evaluation. During the meeting, Osimowicz was openly hostile to Wallace. She told Wallace that she was angry because of Wallace's report to Ford that she was able to work as production supervisor. Also in the interview, Wallace expressly informed Osimowicz that Wallace had no control over the decision by Ford as to whether Osimowicz should be on medical leave or be required to do her job as production supervisor. Osimowicz testified at her deposition that Wallace told her, "I am not your treating physician. Fords [sic] knows I'm just an evaluator, and your doctor knows I'm just evaluating. I'm not treating. If I was treating, you would not be in there. You would not. And I told Fords [sic] that they should follow your treating physician's recommendation."
 
 
 11
 Following the interview, Wallace sent to Ford a handwritten summary of the evaluation, and then, on March 8, she filed a typewritten report, giving her evaluation of Osimowicz. The report concluded that Osimowicz appeared to be exaggerating her depression and stress, that there was no evidence that Osimowicz could not perform her job as production supervisor, and that Osimowicz "appears to have selectively determined her chosen work environment and thus chooses not to work as a production supervisor." Although the report recommended that Osimowicz "be counseled concerning alternatives to production supervisory work," the report did not state or recommend that Ford follow the recommendation of Blom and Schornstein.
 
 
 12
 On March 5, Osimowicz called the plant to request a copy of Wallace's report. She was told that only the summary, not the full report, was in and that the records department was closed because the employees were at a seminar. She was also told that because of Dr. Wallace's evaluation, her absence from work might not be justified. Osimowicz testified at her deposition that she still did not return to work because she thought she was on medical leave. Also on March 5, Osimowicz wrote the medical department and requested a copy of her medical records. On March 7, Osimowicz sent a written request for a copy of her personnel file, her job description, and Ford's policies regarding leave time. On March 12, Dr. Jones instructed the nurses to comply with Osimowicz's request as soon as she came in to sign a medical release form. Osimowicz had previously been informed that she needed to sign a release to get any of her records.
 
 
 13
 About this same time, Dr. Jones reached her final decision that based on Wallace's evaluation, Osimowicz was able to work. This decision, made in Jones's capacity as Ford's medical doctor, was provided to John Corrigan, then Salary Personnel Supervisor. Corrigan, after consulting with his supervisor and certain others from Ford headquarters, decided to treat Osimowicz's absence as a voluntary, unauthorized absence, and Corrigan sent her a letter on March 22 saying:
 
 
 14
 Our records indicate that your last day worked was February 13, 1991. Your absence to date is unauthorized. If you do not report to work by April 2, 1991, or provide to the satisfaction of the Company the reason you failed to report for work, you will be terminated involuntarily as a "Quit."
 
 
 15
 On March 27, Osimowicz's attorney wrote a letter to Ford, asking for clarification of Ford's medical leave policy and requesting prompt attention to Osimowicz's request for medical records.
 
 
 16
 On April 2, the day on which Osimowicz knew she had to return to work or be terminated as a "quit," Osimowicz called John Corrigan and inquired about her status. Corrigan informed her that if she did not show up by the third shift that day, she would be terminated as if she had quit. Osimowicz did not make any attempt to return to work that day.
 
 
 17
 On April 3, Osimowicz called Corrigan and asked if her records were available, and Corrigan said that they were available whenever Osimowicz came down and signed the release. Osimowicz then went to the plant, signed the release, and got the records she requested.
 
 
 18
 On April 8, 1991, Ford sent a letter to Osimowicz confirming that she had been involuntarily terminated on April 2 as a "Quit" for failing to report to work.
 
 
 19
 Osimowicz then filed an action in Michigan state court asserting various causes of action under state law. Ford removed the complaint to federal district court on grounds that certain of Osimowicz's claims were preempted by ERISA. Osimowicz amended her complaint to include specific ERISA causes of action. On Ford's motion for summary judgment, the district court disposed of the entire case in Ford's favor. Osimowicz then brought this timely appeal.
 
 II
 
 20
 Osimowicz raises four main issues on appeal. We address each separately.
 
 A. Breach of Contract
 
 21
 Osimowicz asserts that Ford breached its contract with her in two ways. First, it failed to grant her leave time to which she was entitled under the terms of her employment. Second, it terminated her in violation of the provisions of the Employee Relations Administration Manual.
 
 
 22
 Because these claims "relate to" an ERISA-covered plan, they are preempted by ERISA. See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 (1990); Van Camp v. AT & T Info. Sys., 963 F.2d 119 (6th Cir.), cert. denied, 113 S.Ct. 365 (1992). We must therefore consider whether the facts can support an ERISA claim.
 
 
 23
 To state a claim under ERISA for failure to provide leave time, Osimowicz must show that Ford's refusal to grant her leave time violated the terms of the plan or ERISA's statutory requirements. Ford's benefits policy provides that an employee is eligible for benefits if she is "disabled," which is defined as "unable to work because of an accident, illness, or pregnancy." The plan provides that the plant doctor (in this case Dr. Jones) is vested with the ultimate authority to determine whether an employee is disabled. If an employee's treating physician offers an opinion with which the plant doctor disagrees, "the plant physician should refer the employee to a consultant for examination and impartial recommendation at Company expense.... The plant physician should follow the recommendation of the consultant."
 
 
 24
 In this case, Osimowicz's psychotherapist believed that Osimowicz was unable to work as production supervisor, and Dr. Jones disagreed with this assessment. In compliance with Ford policy, Jones asked Wallace to evaluate Osimowicz. After three sessions with Osimowicz, Wallace concluded that the real reason Osimowicz could not do her work as production supervisor was that she had decided herself that she could not do it. Wallace found no other evidence that Osimowicz could not perform as production supervisor, and therefore offered her opinion that Osimowicz was not disabled.
 
 
 25
 There was no breach of company policy here. Jones was permitted to rely on Wallace's evaluation in concluding that Osimowicz was not unable to act as production supervisor. Therefore, Osimowicz was not entitled to leave benefits and Ford did not violate its plan by denying benefits.
 
 
 26
 Osimowicz argues that even if Ford did not violate its own policies in denying benefits, it did violate ERISA's statutory requirements, which impose certain fiduciary obligations on Ford. As her argument goes, because Dr. Jones was a plan fiduciary within the meaning of 29 U.S.C. Sec. 1002(21)(A), Dr. Jones's referral of Osimowicz to Dr. Wallace made Dr. Wallace a plan fiduciary also, and therefore any of Wallace's statements were binding on Ford and any decisions made by Wallace had to be in keeping with Wallace's fiduciary duties to Osimowicz. She argues that because Wallace told her that if she (Wallace) were Osimowicz's treating physician, she would recommend medical leave for Osimowicz, Ford was bound to grant the medical leave notwithstanding Jones's contrary view and Wallace's other statements informing Osimowicz that she was not Osimowicz's treating physician and could find no evidence that Osimowicz could not perform her job as production supervisor. Osimowicz also argues that this court may not rely on Wallace's statements to the effect that there was no evidence that Osimowicz could not return to her position, because as a fiduciary, Wallace was bound to act only in Osimowicz's best interests.
 
 
 27
 This theory cannot prevail. Although it is conceded that Dr. Jones was a plan fiduciary because she exercised discretionary authority with regard to a component of the plan's administration, it is not clear that an independent evaluator becomes a fiduciary merely by accepting a referral from a fiduciary. Cf. Farm King Supply, Inc. v. Edward D. Jones & Co., 884 F.2d 288 (7th Cir.1989) (finding broker that recommended investments to plan trustees not a fiduciary under ERISA). But cf. Helms v. Monsanto Co., 558 F.Supp. 928 (N.D.Ala.1982) (reviewing decision of fiduciary's delegate as that of fiduciary), rev'd on other grounds, 728 F.2d 1416 (11th Cir.1984). Even if we assume that Dr. Wallace was a plan fiduciary, we find no violation of ERISA by her. We review the discretionary decisions of fiduciaries under the arbitrary and capricious standard of review,[2] see Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989), and upon a complete review of the facts, we find that Dr. Wallace's conclusion that Osimowicz was able to perform her job as production supervisor is supported by the evidence and was not arbitrary or capricious.
 
 
 28
 Osimowicz further contends that the inherent conflict of interest in having a plan fiduciary (Dr. Jones) make determinations about an employee's eligibility for medical benefits is enough to create a violation of ERISA in this case. We disagree. ERISA specifically permits a fiduciary to wear multiple hats. See 29 U.S.C. Sec. 1108(c)(3); Newell v. Prudential Ins. Co., 904 F.2d 644 (11th Cir.1990). And "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " Firestone Tire, 489 U.S. at 115 (quoting Restatement (Second) of Trusts Sec. 187 cmt. d (1959)). The facts of this case do not in any way suggest that whatever conflict of interest Wallace might have had tainted her psychological evaluation of Osimowicz, and we therefore reject Osimowicz's argument.
 
 
 29
 Osimowicz's second breach-of-contract claim is that Ford terminated her in violation of the Employee Relations Administration Manual ("ERAM"). This claim is meritless, for Osimowicz signed a written employment-at-will contract which provided that she could be terminated at any time without notice and that her employment-at-will terms could not be modified except in writing.
 
 
 30
 B. Violation of the Employee Right to Know Act
 
 
 31
 Osimowicz asserts that her rights under the Michigan Bullard-Plawecki Employee Right to Know Act (Mich.Comp.Laws Secs. 423.501-.512; Mich.Stat.Ann. Sec. 17.62-.73) were violated when Ford failed to mail Osimowicz's records to her. Section 3 of the Act states in part:
 
 
 32
 An employer, upon written request which describes the personnel record, shall provide the employee with an opportunity to periodically review at reasonable intervals, generally not more than 2 times in a calendar year or as otherwise provided by law or a collective bargaining agreement, the employee's personnel record if the employer has a personnel record for that employee.
 
 Section 4 states in part:
 
 33
 After the review provided in section 3, an employee may obtain a copy of the information or part of the information contained in the employee's personnel record.... If an employee demonstrates that he or she is unable to review his or her personnel record at the employing unit, then the employer, upon that employee's written request, shall mail a copy of the requested record to the employee.
 
 
 34
 It is clear from the very face of the statute that Osimowicz's rights under the Act were not violated. Ford instructed Osimowicz that any time she came down to the plant and signed a release, she could have her records. She went to the plant and, even without first reviewing them, she received a copy of her records as provided in Section 4 of the Act.
 
 
 35
 Osimowicz contends, however, that Ford was put on notice by the letters sent by her doctors that she was unable to go to the plant to get her records, and therefore Ford should have sent them to her. The facts do not support such a contention. During the time that Osimowicz was allegedly disabled from working as production supervisor, she had no trouble reporting to work to do other jobs there. Furthermore, her contention is belied by her eventual trip to Ford to pick up the very records she alleges she was unable to travel to get. Under Section 4, Osimowicz was required to demonstrate that she was unable to review her personnel record at Ford, and this she did not do. The district court's summary judgment for Ford on this count was appropriate.
 
 C. ERISA Violations
 1. Failure to disclose plan materials
 
 36
 Osimowicz asserts that her rights under ERISA were violated when Ford "refused" to provide her with a copy of the company's policy on medical leaves and Dr. Wallace's report.
 
 
 37
 ERISA requires that certain documents relating to a benefits plan be made available to an employee. See 29 U.S.C. Secs. 1021(a), 1022, 1024(b)(4). If the employer fails to provide such materials within thirty days, the court may award to the participant the statutory penalty of up to $100 a day. 29 U.S.C. Sec. 1132(c)(1). But a plan participant may be denied an award of statutory damages for a company's refusal to provide plan materials if the participant would not have otherwise qualified for the benefits explained in the requested documents. Lesman v. Ransburg Corp., 719 F.Supp. 619 (W.D.Mich.1989), aff'd, 911 F.2d 732 (6th Cir.1990).
 
 
 38
 Osimowicz admits that at least some of these documents (Dr. Wallace's report in particular) were provided to her on April 3, 1993 (within the thirty-day period), when she visited the plant and requested them, but she objects that they were provided to her only after her termination, making this "a useless gesture." Yet, she produces no evidence that she was told that she could not pick them up earlier, which would have been before the termination she knew was imminent if she did not report to work. Nor does she even allege that any previous request to see her records had been refused. The fact that she chose to visit the plant the day after her termination does not make Ford's action a violation of ERISA.
 
 
 39
 The rest of the documents that Osimowicz claims she requested were either previously given to her[3] or would have been of no use to her. She specifically alleges that Ford should have given her an application form for personal leave time.[4] This document would have been of no use to her because under the terms of plan, a copy of which she possessed, she could not qualify for unpaid medical leave. Her plan permitted such leave time only after all medical leave time had been exhausted. Since Osimowicz did not exhaust her medical leave (she could not because she was not eligible for it), her application would have been denied and thus there was no prejudice in Ford's failure to provide such a form to her.
 
 2. Interference with rights under ERISA
 
 40
 Finally, Osimowicz argues that Ford intentionally terminated her in order to deny her benefits under the plan. At oral argument, Osimowicz's counsel emphasized that this point was his main contention on appeal saying, "My entire appeal goes to Sec. 510 [29 U.S.C. Sec. 1140]."[5]
 
 
 41
 Title 29 U.S.C. Sec. 1140 provides in part: "It shall be unlawful for any person to discharge ... a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, [or] this subchapter...." An employee is not required to show that the employer's sole purpose for the discharge was to interfere with her right to benefits, but she must show that the interference was at least a motivating factor in the decision. See Humphreys v. Bellaire Corp., 966 F.2d 1037 (6th Cir.1992).
 
 
 42
 Although Osimowicz's claim is a legally cognizable one, the facts do not bear out such a claim. The only fact that Osimowicz can point to in support of her argument is that her termination followed her request for records. This is simply not enough, for correlation alone does not indicate causation. We agree with the district court when it wrote,
 
 
 43
 There is simply no evidence in the record to support this claim. Assuming arguendo that Osimowicz did not voluntarily quit her position at Ford, it is clear that Ford terminated her because she refused to report to work, not for the purpose of interfering with her rights under the plan.
 
 
 44
 Summary judgment on this count was therefore proper.
 
 III
 
 45
 For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Ford and the dismissal of Osimowicz's complaint.
 
 
 
 [1]
 A third-party evaluator is one to whom the employee is referred when the plant physician disagrees with the medical assessment of the employee's treating physician. Ford pays for this third-party evaluation, which is to be an impartial recommendation as to the disputed issue
 
 
 [2]
 Osimowicz points this out and argues that the district court erred in conducting a de novo review of the decisions of Drs. Jones and Wallace. While we agree that the district court appears to have applied the wrong standard of review, we are puzzled as to why Osimowicz would have preferred that the district court use a narrower standard of review ("arbitrary and capricious" instead of "de novo") when in fact she wished to overturn Jones's decision, not uphold it. In any case, the result reached is the same under either standard, and the district court's alleged error has no impact
 
 
 [3]
 Osimowicz conceded at her deposition that she had in her possession at the time of her disability an employee handbook entitled, "Your Total Compensation." This handbook contains a summary plan description of Ford's medical disability policy
 
 
 [4]
 There is some question as to whether claim forms are even covered under ERISA's document production requirements. See Wesley v. Monsanto Co., 554 F.Supp. 93, 98 (E.D.Mo.1982), aff'd, 710 F.2d 490 (8th Cir.1983). We do not reach this question, however, because we resolve the issue on other grounds
 
 
 [5]
 Yet we note that neither Osimowicz's opening brief nor her reply brief contain much discussion of this issue