Joe Rodger NEWELL, Jr., individually and as natural parent and guardian of minor Joe Rodger Newell, III., Plaintiff–Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant–Appellee.

No. 89–8634.

United States Court of Appeals, Eleventh Circuit.

June 28, 1990.

**646**

James Lee Ford, Ford & Haley, Atlanta, Ga., for plaintiff-appellant.

Ben Kingree, III., Carter & Ansley, Atlanta, Ga., for defendant-appellee.

Before FAY and COX, Circuit Judges, and TUTTLE, Senior Circuit Judge.

FAY, Circuit Judge:

This appeal addresses the issue of the fiduciary obligations of an ERISA trustee that is also an insurance company. Plaintiff-appellant Newell and his family had health insurance coverage under his employer's group contract with defendant-appellant The Prudential Insurance Company of America (Prudential). When Newell's son suffered a medical problem requiring extended hospitalization, however, Prudential denied the greater part of the claim, declaring that its review of the medical records revealed that Newell's claim contained charges excludable under the policy. After unsuccessfully appealing Prudential's decision, Newell sued Prudential in Georgia state court. Prudential removed the case to federal court on the dual bases of diversity and federal question jurisdiction, the latter basis derived from the fact that Newell's claims were governed entirely by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, which preempted Newell's state causes of action. The district court ruled in favor of Prudential, holding that

Prudential did not violate ERISA as a matter of law in authorizing a Prudential employee to make the determination of whether or not charges were excludable, that Prudential did not arbitrarily or capriciously deny the majority of Newell's claim for benefits, and that Prudential provided sufficient notice to Newell of its denial of his claims. We AFFIRM the district court on the first two issues; we REVERSE and REMAND for further findings on the matter of notice.

## I.

At all times relevant to this case, Joe Rodger Newell was an employee of Massey Fair Ingredient Sales, Inc. He and his family participated in Massey Fair's group insurance policy No. GSP–86888M with Prudential, under which they received term life, accidental death or dismemberment, and major medical insurance. The health insurance policy contains several limitations on eligible charges; most pertinent to this case is the following paragraph in the section entitled "Generally Excluded Charges":

The term "Generally Excluded Charges" is used only in a health care expense Coverage. When it is used, it includes all of the following....

....

(3) **Charge for Unnecessary Services or Supplies:**[1] A charge for services or supplies, including tests and check-up exams, that are not needed for medical care of a diagnosed Sickness or Injury. To be considered "needed", a service or supply must meet all of these tests:

(a) It is ordered by a Doctor.

(b) It is commonly and customarily recognized throughout the Doctor's profession as appropriate in the treatment of the Sickness or Injury.

(c) It is neither educational nor experimental in nature.

(d) It is not furnished mainly for the purpose of medical or other research.

1. Elsewhere in the policy, hospital room, board, and all the daily services and supplies furnished by the hospital are encompassed in the definition of services and supplies. Plaintiff's Exh. 1 at 39 [MM R2 1007–(CR 505, BR 505)–1].

Also, in the case of a Hospital stay, the length of the stay and Hospital services and supplies will be considered "needed" only to the extent Prudential determines them to be:

(a) related to the treatment of the Sickness or Injury; and

(b) not allocable to the scholastic education or vocational training of the patient.

Plaintiff's Exh. 1 at 6 [GCS 1011–(CR 011C)–1].

The policy also carries a Pre–Admission and Concurrent Review Service (PACRS) rider. As described by the district court in its factual findings,

[t]he rider provides that the general policy includes the tests for determination of need. However, pursuant to the rider, claimants must request that Prudential make a "determination of need." A determination of need is "a determination by Prudential, under the terms of the Coverage, that approves or disapproves a day or days of Inpatient Hospital Stay . . . as needed for medical care of a diagnosed Sickness or Injury." [Plaintiff's Exh. 1 at] 45. The determination of need is to be made prior to admission. If Prudential finds "medical necessity" for admission, it will inform the doctor and the hospital, by phone, of the number of days of inpatient hospital stay that Prudential approves. The Policy provides that written notice will be sent to the claimant, the doctor and the hospital, indicating the number o[f] pre-authorized days.

The Policy also provides that it may be possible to extend the number of days of inpatient hospital stay that Prudential approves as needed for the medical care of the patient's condition; upon request being made, Prudential will make a new determination of need upon information received [from] the doctor.

*Newell v. Prudential Ins. Co. of America,* 725 F.Supp. 1233, 1235–36 (N.D.Ga.1989).

During the fall of 1986, it became apparent that Newell's son, Joe III, nicknamed "Bear," had a substance abuse problem and suffered from related depression. At first Bear underwent outpatient therapy, but after two months, his attending physician, Dr. Schmits, determined that Bear would be best served by intensive inpatient treatment. Bear was admitted on December 2, 1986, to Greenleaf Center Inc. (Greenleaf), a hospital that provides health care for people with psychiatric or substance abuse problems and has a specialized inpatient program for adolescents with such disorders.

On the day of Bear's admission, Cindy Sedman, the admissions and discharge coordinator for Greenleaf, contacted Prudential to find out about Bear's coverage. She learned that Bear was in fact covered under the policy, but that PACRS would have to make a determination of need for the inpatient hospital stay. Sedman then called PACRS and orally informed them of the estimated length of hospitalization, the diagnosis, and the treatment plan. On December 4, 1986, PACRS sent a form letter to Dr. Schmits confirming Bear's admission and requesting the admission notes and the estimated length of stay. Sedman mailed the requested information to PACRS on the same day.

PACRS approved seven days of hospital stay on December 5, 1986, and relayed that information to Sedman on December 9, 1986. On that same date PACRS apprised Greenleaf and Dr. Schmits of the procedure to obtain extensions of approved days. A PACRS internal memorandum dated December 17, 1986, reflects that 21 additional days were certified and that Sedman was so notified by telephone. When Dr. Schmits contacted PACRS two days later to request a further extension, PACRS advised him that the policy allotted a maximum of 30 days for psychiatric treatment and that the limit had been reached. Dr. Schmits clarified to PACRS that the diagnosis comprised not merely depression, a purely psychiatric malady, but substance abuse as well. PACRS responded with a request for additional records to substantiate this "change" in diagnosis.

Upon receiving the entire chart, on December 24, 1986, PACRS pre-certified coverage through January 13, 1987, a total of

42 days. PACRS notified Sedman of this extension on December 29, 1986. PACRS internal records indicate that after January 13, 1987, the case was to be put on "retro review"; that is, no further days would be pre-authorized, but rather the entire chart would be reviewed upon Bear's discharge and the days, services and supplies deemed necessary at that time would be approved for payment. The record is very unclear, however, about whom, if anyone, PACRS informed of the impending retro review status until long after the decision was made.

Meanwhile, Newell, having heard nothing from either Prudential or PACRS, contacted Gloria Buxton, a regional claims officer for Prudential, on December 29, 1986, to ascertain the situation regarding coverage for Bear's hospitalization. Buxton agreed to look into the case for Newell. The record shows several Prudential internal notes indicating that Buxton's office and Newell communicated by telephone throughout the following months, but the district court only found that Newell again heard from Buxton in a letter dated May 13, 1987.

On January 13, 1987, a Prudential employee called Sedman to notify her that the benefits for substance abuse were unlimited, subject to certification of need by Prudential. Greenleaf on the same day again was advised that Bear's stay had been approved through January 13, 1987. After January 13, 1987, the only communication between PACRS and Greenleaf or Sedman or Dr. Schmits for the next one and a half months consisted of requests for and the submission of hospital records. No information ever went to Newell. Finally, on March 5, 1987, PACRS conducted a full review of all the records received. Dr. Jed Goldart, the staff psychiatrist at PACRS, determined that no medical necessity existed for Bear's hospitalization after January 25, 1987. PACRS sent letters to Greenleaf, Dr. Schmits and Newell on March 9, 1987, informing them of PACRS' decision to deny benefits subsequent to January 25, 1987. The letter further advised that they could forward additional information to PACRS for supplemental review.

After the March 9, 1987, letter, there was a flurry of communication between Greenleaf and PACRS, Drs. Schmits and Goldart, Buxton and Newell, and the Prudential claims office and PACRS. Bear was discharged on April 3, 1987, at which time PACRS requested the entire record. After some difficulties with PACRS receiving the documents, PACRS finally secured the full record on April 29, 1987. On May 13, 1987, based on information obtained from Dr. Goldart, Buxton wrote Newell, essentially restating Prudential's position that benefits would not be forthcoming for Bear's hospitalization after January 25, 1987, because of lack of medical necessity.

On June 1, 1987, Newell's counsel wrote a letter to Prudential demanding immediate payment for the entirety of Bear's treatment at Greenleaf. In response, on July 7, 1987, Dr. Goldart submitted Bear's hospital records to the American Psychiatric Association (APA) for independent review. Two psychiatrists with the APA's Peer Review System evaluated Bear's hospital charts and determined that inpatient treatment was not medically necessary after January 25, 1987. Prudential communicated this finding to Newell on August 30, 1987.

Newell brought suit against Prudential in state court seeking payment for the full medical treatment under Georgia law, as well as a punitive award penalizing Prudential for its alleged bad faith refusal to pay, reasonable expenses, costs and attorney's fees, and any other appropriate relief. Prudential removed the case to federal court, asserting federal diversity jurisdiction and recognizing that Newell's state cause of action had been preempted by ERISA and should have been instituted in federal court under ERISA. After a two-day bench trial and the submission of post-trial briefs, the district court held that Prudential had not violated its fiduciary duty nor acted arbitrarily or capriciously in denying Bear benefits after January 25, 1987. Nor did the court find insufficient Prudential's notice to Newell of its decisions to deny benefits. The trial court also denied Newell's motions for consideration for class certification and for leave to amend,

stating that Prudential would be significantly prejudiced if the court granted these motions initiated after the case had been tried.

Subsequently, Newell made another motion to amend and also moved for judgment to be entered in his favor. In response, Prudential brought to the court's attention *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), a Supreme Court case that modified the standard of review applicable to ERISA cases involving the denial of benefits. The court directed the parties to "file briefs addressing the impact that the change in the applicable standard of review has on this action." R1–29–2. After reviewing the parties' submissions, the district court issued a second order essentially affirming its first judgment, finding that *Firestone* did not affect its earlier decision and that it had examined the facts under the proper standard of review. The district court additionally found that Prudential did not operate under a conflict of interest by having its employee, Dr. Goldart, decide—and later review his own decision—what services and supplies were medically necessary; therefore no heightened scrutiny was required under *Firestone.* Newell appeals the district court's orders.

## II.

■ We review the district court's factual findings for clear error. Fed.R.Civ.P. 52(a); *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Keefe v. Bahama Cruise Line, Inc.,* 867 F.2d 1318, 1321 (11th Cir.1989) (per curiam). We subject the district court's legal conclusions to de novo review. *Kirkland v. National Mortgage Network, Inc.,* 884 F.2d 1367, 1370 (11th Cir.1989); *McDonald v. Hillsborough County School Bd.,* 821 F.2d 1563, 1564 (11th Cir.1987).

## III.

### A.

■ We cannot disagree with the district court's conclusion that "Prudential did not

violate ERISA as a matter of law by allowing a Prudential employee to make decisions concerning medical necessity of inpatient care." *Newell,* 725 F.Supp. at 1240. Newell argues that Prudential's procedure of having its own employee, Dr. Goldart, determine what services and supplies will be deemed medically necessary and thus eligible for payment of benefits creates an impermissible conflict of interest in violation of ERISA. ERISA particularly provides, however, that "[n]othing in section 1106 of this title [which delineates prohibited transactions involving impermissible conflicts of interest] shall be construed to prohibit any fiduciary from ... serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest." 29 U.S.C.A. § 1108(c)(3) (West Supp.1990).

ERISA defines a fiduciary as one who "exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of its assets ... or [who] has any discretionary authority or discretionary responsibility in the administration of [the] plan." *Id.* at § 1002(21)(A)(i), (iii). Thus both Dr. Goldart and Prudential are fiduciaries of the group plan under which Newell was insured. "The term 'party in interest' means, as to an employee benefit plan[,] any fiduciary ... of such employee benefit plan...." *Id.* at § 1002(14)(A). Prudential falls within the definition of a party in interest. ERISA clearly excludes from the realm of the impermissible a person occupying the dual role of fiduciary and employee of a party in interest, such as Dr. Goldart. This court has ruled accordingly in cases presenting similar facts that no violation of ERISA occurred. *See, e.g., Local Union 2134, U.M.W. of America v. Powhatan Fuel, Inc.,* 828 F.2d 710, 713 (11th Cir.1987) (no inherent conflict of interest where officer of corporation also fiduciary of corporation's health plan); *Deak v. Masters, Mates & Pilots Pension Plan,* 821 F.2d 572, 580 (11th Cir.1987) (trustees breached no ERISA duties solely by having fiduciary duties to both the Union or the employer and the plan beneficiaries), *cert.*

*denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Evans v. Bexley,* 750 F.2d 1498, 1499 (11th Cir.1985) (as fiduciary may also serve as an officer, employee or other representative of a union or employer, logic demands that the fiduciary may "fulfill the concomitant responsibilities"); *see also Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan,* 854 F.2d 1516, 1531–32 (3d Cir.1988) (plan fiduciaries' reliance on in-house counsel to aid them in interpreting and administering the plan, rather than hiring independent counsel, not a violation of ERISA), *cert. denied,* — U.S. —, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989). We therefore affirm the district court's holding that the Prudential procedure of having its own employee make determinations of medical need does not violate ERISA as a matter of law. In rejecting this theory of liability against Prudential, we also dispose of Newell's request for remand for consideration of class certification based on this misperceived violation of ERISA.

### B.

While we are in accord with the district court in its judgment that "Prudential did not arbitrarily and capriciously deny plaintiff's claims for benefits after January [25], 1987," *Newell,* 725 F.Supp. at 1240, we must reevaluate that conclusion applying the heightened scrutiny for arbitrariness and caprice appropriate in cases involving a conflict of interest rather than the simple arbitrary and capricious standard used by the district court. The Supreme Court in *Firestone* clarified the standard for reviewing denials of benefits in ERISA plans, holding that

> a denial of benefits challenged under § 1132(a)(1)(B) [2] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... Of course, if a benefit plan gives discretion to an admin-

istrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor[ ] in determining whether there is an abuse of discretion." Restatement (Second) of Trusts § 187, Comment *d* (1959). *Firestone,* 489 U.S. at —, 109 S.Ct. at 956–57. The district court correctly concluded that because the Prudential plan in question gives Prudential some degree of discretion in determining whether charges would be deemed necessary and eligible, *Firestone* would sanction the continued application of the arbitrary and capricious standard to the instant case. *See also Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1558 & n. 1 (11th Cir.1990); *Jett v. Blue Cross & Blue Shield,* 890 F.2d 1137, 1138 (11th Cir.1989); *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 38 (11th Cir.1989). The district court further found that Prudential did not operate under a conflict of interest by having its employee, Dr. Goldart, render claims decisions; thus the district court saw no need to temper the arbitrary and capricious test to consider a conflict that the court believed did not exist. In this conclusion we differ.

This court declared in a most recent decision that

> [o]ur task is to develop a coherent method for integrating factors such as self-interest into the legal standard for reviewing benefits determinations. This task reaches the height of difficulty in a case such as the one before us, where an insurance company serves as the decisionmaking fiduciary for benefits that are paid out of the insurance company's assets....
>
> . . . .
>
> ... Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business.... We conclude ... that a

---

**2.** "A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to

clarify his rights to future benefits under the terms of the plan." 29 U.S.C.A. § 1132(a)(1)(B) (West 1985).

"strong conflict of interest [exists] when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims...." *Jader v. Principal Mutual Life Ins. Co.,* 723 F.Supp. 1338, 1343 (D.Minn.1989).

The inherent conflict between the fiduciary role and the profit-making objective of an insurance company makes a highly deferential standard of review inappropriate. *Brown,* at 1561–62. Prudential stands in a position identical to that of Blue Cross in *Brown.* The district court erred in holding that this case did not warrant increased examination for abuse of discretion.

■ This court crafted a new, more stringent standard of review when a conflict of interest has been shown to exist on the part of the fiduciary rendering benefits decisions, placing the burden on the fiduciary to "prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest" and to show that it operated "exclusively in the interests of the plan participants and beneficiaries." *Id.* at 1566, 1568. This court held that "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Id.* at 1566–67 (footnote omitted). In practice, this standard requires us first to determine the legally correct plan interpretation, and then, if Prudential's interpretation differs, whether Prudential was arbitrary and capricious in employing a different interpretation. *Id.* at 1570.

The provisions of the PACRS rider require Prudential to make a determination of need for hospitalization upon request.[3] According to the body of the policy, the charges associated with the hospitalization will be considered "needed" by Prudential only insofar as they are services or supplies ordered by a doctor, related to the treatment of the diagnosed ailment, commonly and customarily recognized throughout the doctor's profession as appropriate in treating the diagnosed ailment, neither educational or experimental in nature, not furnished primarily to further any type of research, and not allocable to the scholastic education or vocational training of the patient. Upon reaching a determination of how many days should be approved as needed for the medical care of the patient's condition, Prudential must tell the doctor and the hospital of the number of days, if any, approved and confirm this information by written notice to the employee, the doctor and the hospital. No benefits are payable for days of inpatient hospital stay not approved as needed by Prudential; such unpaid days may comprise the entire hospital stay if no days are approved.

■ Newell alleges that Prudential arbitrarily and capriciously failed to abide by its own policy guidelines, first in subjecting Bear's claim to retro review, and then by denying benefits based on factors Newell maintains are extraneous to the terms of the policy. For his first assertion, Newell relies on language in the insurance booklet provided to Massey employees which states that "[t]he purpose of PACRS is to make sure that, before incurring expenses you understand the length of inpatient hospital stay that will be considered reasonably necessary under the coverages." Plaintiff's Exh. 2 at 10 [ (BR 010) ]. Newell interprets this language to mean that Prudential has an obligation to make any decision concerning eligibility for benefits before the hospital care is provided. We disagree.

The employee insurance booklet refers the reader to the full PACRS rider for details of the program. The PACRS rider obligates Prudential only to notify the interested parties of how many days it has approved as necessary and warns the read-

---

**3.** In actual practice PACRS makes the determinations of need and communicates the number of approved days to the doctor, hospital and insured. PACRS also transmits this information to the appropriate Prudential claims office that will actually pay out the benefits. For simplicity, we will not differentiate between PACRS and Prudential but will refer to Prudential throughout.

er that any days not so approved are not payable. In the case of Bear's hospitalization, Prudential approved inpatient care through January 13, 1987, on December 24, 1986, and telephoned Greenleaf and Dr. Schmits with that information on December 30, 1986, well before the pre-authorized days had expired. If in fact Prudential advised the interested parties of the upcoming retro review status and that no further approved days were forthcoming until Bear's discharge (an issue we address below), it appears to us that Newell had to be aware that any additional days of hospital stay might be considered unnecessary and unpayable. It would seem that the 42 days approved served as some indication of the period that Prudential considered "reasonably necessary under the coverages." *Id.* That Prudential eventually approved only 12 of the additional 80 days Bear spent in hospital was a gamble that Newell took, not an abuse of discretion or an arbitrary interpretation of the plan by Prudential.

■ Newell also asserts that Dr. Goldart utilized subjective criteria outside of the tests contained in the policy to determine that much of Bear's hospital stay was medically unnecessary. We find this charge unsupported by the record, as did the district court. Dr. Goldart in reviewing Bear's charts from the outset personally questioned the necessity for Bear to undergo inpatient rather than outpatient treatment, as, in his experience, the information in the admissions sheets reflected no problems sufficient to warrant acute inpatient care. Nonetheless, giving the benefit of the doubt to Dr. Schmits, Dr. Goldart approved an initial seven days of hospitalization. The charts accompanying the requests for extension of approved days revealed to Dr. Goldart no need for structured inpatient supervision: Bear was under no restrictions nor was he taking any medications for his depression; his medical evaluations showed no inability to cope, no problems with cooperating with therapy or participating in the activities at Greenleaf, no inability to function normally. Instead the hospital records indicated that Bear was "responding well to treatment, was eating and sleeping well, was participating in group activities and had accepted his alcohol dependency." *Newell,* 725 F.Supp. at 1239. His personal professional opinion notwithstanding, Dr. Goldart granted extensions of approved days in the end totalling 54 days, 12 days longer than the protocol or average length of stay for people diagnosed with Bear's condition. Dr. Goldart determined that any additional days of hospital stay could not be approved as needed since more than 50 days of inpatient treatment for adolescent substance abuse was not "commonly and customarily recognized throughout the Doctor's profession as appropriate in the treatment of [substance abuse]." Plaintiff's Exh. 1 at 6. Similarly, Dr. Goldart could not substantiate that Bear's continued hospitalization was sufficiently related to the treatment of his substance abuse as to be considered needed under the policy. The subsequent APA review of Bear's case confirmed the correctness of Dr. Goldart's determination. We conclude that Dr. Goldart did apply the appropriate policy tests of need in making his determination of need and that he did not abuse his discretion in denying benefits after January 25, 1987.

### C.

■ Finally, we cannot let stand the district court's finding that Prudential's failure to follow its own notification procedures did not constitute arbitrary and capricious conduct. First, the court used the more lenient abuse of discretion standard rather than the heightened inquiry befitting the conflict of interest present in this case. Second, we question the facts as found by the district court in reaching its conclusion on this issue.

As we previously noted, the PACRS rider to the Prudential policy is described in the group insurance booklet as a means of ensuring that the insured would know before incurring medical expenses how much of a contemplated hospital stay would be covered by insurance benefits. Upon receiving a properly submitted request for a determination of need, Prudential is obliged to make its determination within a reason-

ably prompt period of time [4] and inform the doctor and the hospital of how many days it has approved as needed. Additionally, Prudential is to confirm this information by written notice to the hospital, the doctor and the insured. The PACRS policy mentions nothing about retro review.

The district court found that "[Prudential] did notify the Newells and Greenleaf of the pre-authorization for Joe Newell, III's initial 7 days of hospitalization. However, subsequent written or oral notifications of additional days of certification were not forthcoming. Only on March 9, 1987 did [Prudential] finally meet its standard of affording proper written notification." *Newell*, 725 F.Supp. at 1239. Our review of the records discloses that Newell never received any written notice of any of the approved days until he received the March 9, 1987, letter. It also appears that much telephonic dialogue took place before March 9, 1987, between Greenleaf, Schmits or Newell and various Prudential personnel regarding extensions and benefits, although the testimony varies widely about what and when information was given or received. What is certain is that the March 9, 1987, letter was the first proper notice from Prudential to Newell that Newell would be responsible for all the hospital expenses incurred after January 25, 1987.

We believe that the undue delay in notifying Newell of what length of hospital stay had been approved or disapproved and the delay in or failure to notify Newell of placing the case in retro review status constitutes arbitrary and capricious conduct on the part of Prudential. The purpose of the PACRS procedure is to allow an insured to forecast what his or her expenditures may be and to calculate what treatment he or she can afford. Had Prudential given Newell timely notice that it could not authorize any days of hospitalization past

January 25, 1987, as medically necessary, he could have consulted with Dr. Schmits and Greenleaf to arrive at an alternate form of treatment that would have served Bear's needs and at the same time would have been eligible for benefits. At the very least Newell could have decided whether or not he could afford to keep Bear in the hospital. Instead, Prudential left Newell hanging, not knowing how many days had been approved or that the type of review had changed from concurrent to retro review. The only means by which Newell could have avoided unwittingly incurring great personal debt would have been to dispute Dr. Schmits' judgment that it was in Bear's best interest to be hospitalized and take Bear out of Greenleaf until Prudential got around to informing him of what length of hospital stay it would approve. This court in *Brown* described an analogous situation of not following a doctor's instructions to the possible detriment of one's health in order to wait for an insurance company to authorize benefits as "dangerous if not wholly absurd," and we agree. *Brown*, 898 F.2d at 1572. We hold that Prudential abused its discretion in ignoring the policy standards for providing notice to Newell and that Prudential is liable to Newell for the hospital expenses incurred between January 25, 1987, and when Prudential first informed Newell either that it had placed Bear's case on retro review or that no benefits would be available for hospitalization after January 25, 1987. We are unable to ascertain from the conflicting testimony and documentary evidence in the record what the last day of Prudential's liability would be; we remand to the district court for factual findings on this point.

In accordance with the foregoing, we AFFIRM the district court's holdings that

---

4. The PACRS rider requires for non-emergency admissions that written requests be sent to Prudential at least a week before the hospital stay starts; telephoned requests can be made one weekday before the beginning of the hospital stay. Emergency admission requests must be made by the second weekday after the patient is admitted to hospital. Extensions of approved days can be requested by phoning Prudential sometime before the already pre-approved days end. From these provisions we conclude that Prudential generally must expect to make a determination of need within 24 to 48 hours of receiving the request in order to inform the hospital and doctor of whether the hospital stay has been approved before the hospital care has been provided.

Prudential did not violate ERISA either in allowing Dr. Goldart to determine the medical necessity of inpatient care or in denying Newell's claims for benefits after January 25, 1987. We REVERSE the district court's holding that Prudential provided sufficient notice to Newell, rather holding Prudential liable to Newell for its arbitrary and capricious failure to provide Newell with notice within a reasonable period of time. We REMAND to the district court for factual findings regarding the period of Prudential's liability and for other proceedings not inconsistent with this opinion.