James G. CALLOUGH, Plaintiff,

v.

**E.I. DU PONT DE NEMOURS
and Company, Defendant.**

Civil No. 1:95–CV–0943–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 3, 1996.

1224

Anthony James McGinley, Office of Anthony J. McGinley, Marietta, GA, for Plaintiff.

Gardner G. Courson, Jana L. Evans, Glass McCullough Sherrill & Harrold, Atlanta, GA, for Defendant.

### *ORDER*

CARNES, District Judge.

This case is presently before the Court on defendant's Motion for Summary Judgment [19]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Summary Judgment is granted.

### BACKGROUND

This is an action brought pursuant to the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover benefits under an employee welfare benefit plan. The plaintiff is a former employee of defendant E.I. du

Pont de Nemours and Company (hereinafter "DuPont").

The plaintiff began work for defendant on January 19, 1973 as a Technical Service Representative. Plaintiff was promoted several times over the years, and by December 1991, he occupied the position of Regional Sales Manager, South within DuPont's printing and publishing business. In that position, three district managers reported to plaintiff and approximately 50 people reported to those three individuals. In March, 1993, plaintiff reported to Robert D. Wyatt, North American Sales Director, Printing and Publishing. Wyatt reported directly to Jerome M. Smith, the head of DuPont's Printing and Publishing business.

On March 17, 1993, plaintiff was informed by Wyatt that he was being removed from this position. The day after plaintiff was informed that he was being removed from his position, he wrote a personal and confidential memorandum to Wyatt. (Def.Mot. for Sum.J. [19] at Ex. 14.) In that letter, plaintiff summarized his understanding of the factors in the decision to remove him from his position. Regarding the factors in the decision, plaintiff wrote that "the leadership team has decided that [he] was not in alignment with the change we're leading in the organization or our general direction." (Id. at 2.) Additionally, plaintiff wrote under the heading "attitude and behavior in leadership interactions," that he was "viewed to appear cynical and not-on-board, and [his] style of open and frank push-back or sharing of my opinions and views lead to these perceptions." (Id.)

In a voice mail response to plaintiff's memorandum, Wyatt, stated:

One of the things you didn't speak to [in your memorandum] is a factor and the decision to replace you has to do with the sales results. You and I talked about that and I think certainly there are a lot of areas that we continue to discuss around that but both of us I think agree the sales results are not where you want them to be, where I want them to be or where they need to be. To say that was not a factor would not be a fair summary of our discussion or what the true factors are in the decision.

(Id. at Ex. 35 at 2.) Later in the same voice mail, Mr. Wyatt spoke of the leadership team's concerns about plaintiff's perceived leadership deficiencies as a factor behind his removal:

The factors in the decision—I want to make sure that you don't lose sight of, uh, the view of the leadership team of your—your leadership and it's not just a perception problem. And I think it would be an easy conclusion to say well, you know, I'm perceived in a way that is different than I am and I think that would be a mistake. My view is that the attitude and behavior patterns that we discussed on the 17th—not just me but others on the leadership team have observed and I think in a couple of cases I've specifically discussed with you, coached you on in the last six months or so are real.

(Id.)

At all times material to this action, defendant maintained an employee welfare benefit plan, which was titled "Career Transition Financial Assistance Plan" (hereinafter "CTFA Plan" or "CTP" Plan). (Def.Mot. for Sum.J. [19] at 30.) Defendant established the CTFA Plan for the benefit of employees who lose their jobs with defendant due to "lack of work." Under the terms of the CTFA plan, eligible employees are entitled to receive financial assistance equal to one month's pay for each two years of service, with a minimum of two month's pay and a maximum of twelve month's pay. (Id. at 3.) Specifically excluded from eligibility are employees who resign or who are discontinued or discharged. (Id.)

Defendant is the administrator of the CTFA Plan and has the authority to control and manage operation of the Plan. Significantly, the defendant has the discretionary right to determine eligibility for benefits under the Plan and to construe its terms and conditions. The Plan provides that decisions of defendant on questions involving interpretation of the Plan are final. (Id.)

Five days after being notified of his removal, plaintiff made an inquiry as to his potential eligibility under the CTFA Plan. In a

memorandum prepared by plaintiff recapping a telephone conversation with the Human Resource Manager, Ms. Didi Bowditch, plaintiff wrote that Bowditch told him that his position had not been "excessed," that it would be filled "as is" and that CTFA Plan benefits would not be available. (Def.Mot. for Sum.J. [19] at Ex. 15.) According to this memorandum, Bowditch did, however, agree to revisit the issue of plaintiff's eligibility under the Plan. (*Id.*) In a voice mail dated March 23, 1993, Ms. Bowditch communicated back to plaintiff that her conclusion on the issue had not changed:

> [I] have reviewed the CTP, career transition plan as an option for you and have confirmed that since we're replacing your job, as is, *that is not a program that would be available to you....*

(Id. at Ex. 35 at 1 (emphasis added).) Plaintiff then confirmed his understanding of this conversation in a memorandum to Bowditch by writing, "You have already confirmed that the new Career Transition Plan would *not* be available because my specific position was not being declared excess." (Def.Mot. for Sum.J. [19] at Ex. 17 at 1 (emphasis in original).)

Plaintiff was thereafter placed on "special assignment" and given two primary functions: (1) to facilitate the transition to the individual chosen as his replacement; and (2) to search for new employment for himself both inside and outside of DuPont. By the end of July 1993, plaintiff was no longer performing any work for defendant, although he remained a full-time employee and frequently requested project work.

In August 1993, plaintiff was told that he would be discharged on November 30, 1993 unless he could locate a position within Du-Pont prior to that time. Unable to meet this condition, Plaintiff was terminated on November 30, 1993.

In April 1994, plaintiff began working for Toyo Ink, a manufacturing company. At the time of his deposition, plaintiff's salary at Toyo Ink was $125,000 per year, which is approximately $15,000 more than what he was earning at the time of his departure

from DuPont. Plaintiff additionally receives benefits from his new employer comparable to those which he received from defendant.

## DISCUSSION

### I. Summary judgment standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. at 2553; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir. 1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence[1] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

---

1. The non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. at 2510. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* at 249–50, 106 S.Ct. at 2510–11. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II. Defendant's Motion for Summary Judgment

This case is before the Court on review of defendant's decision not to extend CTFA Plan benefits to plaintiff. CTFA Plan benefits are available only to employees who are "terminated due to a lack of work;" the Plan explicitly disallows such benefits for employees who have been "dismissed." According to defendant, the phrase "lack of work" embraces only those employees who have been terminated as a result of "management-driven, cost-related downsizing or reduction in force." (Def.Mot. for Summary Judgment [19] at 18.) Specifically excluded from coverage under this interpretation are those employees who are replaced for performance reasons. (*Id.* at 13.)

Defendant denied CTFA Plan benefits to plaintiff because it had "dismissed" plaintiff from his position; plaintiff was not terminated from his position due to "lack of work." Indeed, another person was hired to fill that position. Accordingly, defendant requests that the Court grant summary judgment on plaintiff's claim that he is entitled to benefits under the CTFA Plan.

Plaintiff advances a very different interpretation. According to him, the phrase "lack of work" may be reasonably construed as "mean[ing] that defendant did not have available work for him to do." (Pl. Response [20] at 2.)

### A. Standard of review

Deciding a case such as this one requires the Court to apply the somewhat elusive standards of review required for ERISA cases in which the claims administrator has denied a particular claim. The parties do not quarrel over the facts in this case, but instead argue over the construction of a term in the plan: "terminat[ion] due to lack of work."

█ The first principle in reviewing such a decision is that where a plan confers discretion on an ERISA plan administrator to construe plan terms, a court reviews the decision under an arbitrary and capricious standard; where it does not confer discretion, the court reviews the administrator's interpretation of plan terms under a *de novo* standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). Because this plan, like most, does confer discretion, the Court would review the decision under the more deferential standard, were this first principle the last word. It is not, however. The Supreme Court went on to add that if the administrator who has discretion is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there was an abuse. Thus, a decision that might otherwise seem reasonable and be approved will perhaps not be deemed reasonable if it turns out that the administrator had a conflict.

█ The Eleventh Circuit has determined that this standard, which aspires to be less stringent than *de novo* but more stringent than an abuse of discretion standard, is a

modified or heightened arbitrary and capricious standard. *Newell v. Prudential Ins. Co.*, 904 F.2d 644, 649 (11th Cir.1990); *Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1561 (11th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). The plan at issue in this case gives the defendant, as plan administrator, discretionary authority to determine eligibility for benefits and to construe the terms of the plan.[2] A defendant that administers its own plan is presumably operating under a conflict of interest. Defendant concedes as much, when it admits that the Plan's benefits were not separately funded but instead came directly from the company's general assets. (Def. Mot. for Summary Judgment [19] at 11.) Accordingly, the appropriate standard of review is the "modified" or "heightened" arbitrary and capricious standard. *Brown*, 898 F.2d at 1560–61.

 As a gloss to this standard, the Eleventh Circuit has recently outlined the analysis to be used in deciding cases involving disputed interpretations of the scope of coverage of the plan. First, the Court must determine whether the plaintiff "has proposed a 'reasonable' interpretation of the plan under which he would be covered." *Nightingale v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1481 (11th Cir.) (quoting *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1549–52 (11th Cir.1994)), *cert. denied*, —— U.S. ——, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995). If the Court finds that plaintiff has advanced a reasonable interpretation, then under *contra proferentum*, which requires ambiguities in a document to be construed against the drafter, the Court must take plaintiff's interpretation as correct. *Nightingale*, 41 F.3d at 1481; *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551 (11th Cir.1994).

 Under the modified arbitrary and capricious standard, the burden then shifts to the defendant to prove that its interpretation was both reasonable and untainted by self-interest. *Nightingale*, 41 F.3d at 1483. The defendant can discharge its burden by showing that its wrong but reasonable interpretation benefits the class of all participants and beneficiaries. *Brown*, 898 F.2d at 1566–67. *See Newell*, 904 F.2d at 651.

## B. Reasonableness of Plaintiff's Proffered Interpretation

The heightened arbitrary or capricious standard requires the reviewing court to blend simultaneously deference with skepticism: a difficult psychological feat. For that reason, this Court suspects that, in its practical application, the heightened arbitrary or capricious standard is generally going to operate much like a *de novo* standard.[3]

At any rate, if a defendant survives a *de novo* standard, it will certainly prevail under a heightened arbitrary and capricious standard. Moreover, the former standard is consistent with the first element of the *Nightingale* test. That is, under *Nightingale*, when the parties differ on the interpretation to be given to a particular provision of the policy, the Court must first determine whether the plaintiff has proposed a "reasonable interpretation of the plan." *Nightingale*, 41 F.3d at

---

2. The Plan provides, in pertinent part:

The Company is the Plan Administrator.... The Company shall have the discretionary right to determine eligibility for benefits hereunder and to construe the terms and conditions of the this Plan. The decision of the Company shall be final with respect to any questions arising as to the interpretation of this Plan.

(Def.Mot. for Sum.J. [19] at Ex. 30 at ¶ VI.)

3. In practical terms, a *de novo* standard means that the reviewing court substitutes its judgment for the administrator and will affirm only if it agrees with the administrator's decision; an abuse of discretion or arbitrary and capricious standard means that the reviewing court will

affirm merely if the administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision-maker. It is hard to envision a scenario where a decision that passes muster under the heightened arbitrary and capricious standard would not also succeed under a *de novo* standard or conversely where a decision that does not survive a *de novo* review would prevail against a heightened arbitrary and capricious test. Indeed, the discussions in cases that have applied the latter standard generally seem to sound much like the sort of analysis that would have occurred had the standard applied been a *de novo* standard.

1481.[4] Thus, the first question is whether plaintiff's interpretation of the phrase "lack of work" is reasonable. The Court concludes that it is not.

### 1. *March 23, 2993, Denial of Benefits*

■ The Career Transition Financial Assistance Plan provides severance pay, pursuant to a formula, to employees "who are terminated due to lack of work," but explicitly makes such pay unavailable to an employee who "is discontinued, enters military service, or is discharged." (Callough Tr., Exh. 30). In establishing the plan, defendant sent a letter to all its managers outlining the reasons for creating the CTFA Plan. (Def.Mot. for Sum.J. [19] at Ex. 8.) The letter bills the plan as a "new approach" to the problem of work force downsizing and states that it is designed to "handle excesses over time." (*Id.* at 1–2.) Defendant also points to a later document entitled "Questions and Answers about Career Transition Plan" which has similar language. (*Id.* at Ex. 8 at 3.) In discussing the issue of eligibility, the document states that the Plan covers those working in "a business, function, site or unit that has determined that it has more employees than it has work to be done." (*Id.*)[5]

As noted *supra,* Robert Wyatt informed plaintiff on March 17 that he was being removed from his position as Regional Sales Manager. In this and subsequent communications, Wyatt made clear to plaintiff that his dismissal was based on certain of plaintiff's leadership deficiencies, as well as sales results that top management considered disappointing. Moreover, plaintiff's job was not eliminated; instead, he was replaced by another person as Regional Sales Manager.

Within a few days, plaintiff had inquired about his eligibility under the CTFA Plan and was told his position had not been excessed and hence he was not eligible for the Plan. This denial of benefits was finalized on March 23, 1993 and plaintiff confirmed his understanding that this decision had been reached.

■ Accordingly, defendant rendered its decision concerning the Plan on March 23, 1993, within a week of advising plaintiff that he was being dismissed. Although plaintiff tries to focus on events that occurred eight months later, *see infra,* in reviewing defendant's decision to deny plaintiff benefits, the Court must look "only to the facts known to the administrator at the time the decision was made to deny [plaintiff] coverage." *Lee,* 10 F.3d at 1550; *accord, Jett,* 890 F.2d at 1140. The facts known to defendant in late March, 1993 were that plaintiff had been dismissed from his position for performance reasons and that a new person would be hired to replace him. Defendant was also aware that its Plan provided for financial assistance only if an employee were "terminated due to lack of work;" that plan's benefits were not available if the employee were "dismissed." Defendant determined that plaintiff was not eligible under the Plan.

The only other interpretation that plaintiff could possibly offer is that whenever an employee is dismissed for unsatisfactory performance and not given another position, he necessarily has been terminated due to lack of work, inasmuch as the employer obviously did not have another job to give him. Such an interpretation is clearly not reasonable. It would mean that the Plan's explicit refusal to offer benefits to an employee who has been discharged could never be given effect. It also would render redundant the explicit provision that the Plan is available only to an employee who has been terminated "due to a lack of work," because under plaintiff's interpretation, these benefits would be available to anyone who was discharged, for whatever reason. Beyond the fact that such an interpretation makes no sense, it also presumes that if an employer terminates an employee from one position and does not offer the employee a different position, the employer has done so because there was no other position available. Yet, there may have been plenty of other jobs, but the employer may

---

4. If the plaintiff has not advanced a reasonable interpretation, he logically should lose, as well, under a *de novo* standard.

5. Even were the Court looking only to the terms of the plan, by itself, it would reach the same result in this case.

not have felt the employee qualified for such a position.

Accordingly, looking only to the decision made in late March and applying a *de novo* standard, the Court concludes that plaintiff's proffered interpretation is not reasonable and that defendant should prevail.

### 2. *Events after March 23, 1993*

■ Plaintiff's real contention, however, is that events occurring after his notification that he was not eligible for the Plan should be considered and, when considered, reveal that he was terminated "due to a lack of work." As noted, defendant did not immediately take plaintiff off the payroll after terminating him in March. Instead, he was kept on the payroll temporarily and given two assignments: (1) to assist in the transition for the individual who was replacing him and (2) to find himself a new job, either inside or outside the company. By July, plaintiff was performing no work for defendant and was only looking for a job. In August, defendant informed plaintiff that he would be discharged on November 30, unless he could locate a job within DuPont before that time. Not finding such a position, plaintiff was terminated on November 30, 1993. Four months later, he began working for a different company.

Adding these subsequent events to the mix, plaintiff argues that at the time he left the employ of the company, he did so because there was no work for him and, accordingly, his termination was "due to a lack of work." As noted, defendant had already informed plaintiff in March, at the time that he was terminated from his position as Regional Sales Manager, that he would not be eligible for CTFA benefits because his position had not been excessed, but instead plaintiff was being dismissed from that position. Defendant still maintained plaintiff on the payroll for eight months to give him time to find another job, however. Plaintiff argues that it is this eight month period of continuation on the payroll that confers upon him eligibility for the severance benefits.

It is true that upon his termination from the payroll in November, plaintiff once again inquired about his eligibility under the plan. (Def.'s Mot. for Sum.J., [19] at 17 n. 11.) There are equitable reasons, however, to resist plaintiff's efforts to shift the focus to events following the decision in March to deny plaintiff CTFA benefits. That is, after defendant informed plaintiff that he was not eligible for benefits, without any apparent objection by him to that decision, defendant allowed plaintiff to stay on the payroll for eight months at full pay to enable plaintiff to be compensated while he was looking for a job. This eight month period was just two months shy of the ten months pay that plaintiff would have been entitled to had he been eligible for benefits when he was dismissed from his position in March.[6] Had defendant known that plaintiff would accept that eight months worth of salary and then sue to get an additional ten months of pay under the CTFA plan, it likely would not have given plaintiff eight paid months in which to find another job or, at least, would have sought his agreement that he would seek no additional benefits at the conclusion of this period.

Assuming, however, that the date of denial of plaintiff's claim should be set constructively as November 30, 1993, the date he left the company's payroll, the Court concludes that plaintiff's challenge still fails. Asking again the first question—whether plaintiff's interpretation is reasonable—the court concludes that it is not. Plaintiff argues that when he was let go in November, it was because he could not find another suitable position and hence there was no work for him. Framing the issue then to include these subsequent events, with regard to an employee who is dismissed for performance reasons, but allowed to stay on the payroll temporarily to attempt to find another job, within or outside the company, has such an employee been terminated "due to a lack of work" or has such an employee been "dismissed?" This Court concludes that it is the latter.

---

**6.** Under the CTFA plan, plaintiff is paid one month's pay for each two years of service. (Def.Mot. for Sum.J. [19] at Ex. 23 at 3.) Plain-

tiff worked for DuPont for approximately 20 years so he would be entitled to 10 months of pay under the CTFA plan.

The provision permitting benefits for employees who were discharged for lack of work obviously addresses situations in which the company had downsized or excessed a particular position and the employee's job was thereby eliminated. This provision clearly does not refer to a situation in which the company dismisses an employee, retains the position from which the employee was dismissed, replaces the employee, but then gives the employee several months to find another job before that employee is terminated from the payroll.

In essence, following his dismissal in March, plaintiff was an applicant for a new position in the company, albeit a paid applicant. His inability, as an applicant, to find another position does not transform his dismissal from his position—a position for which a replacement was hired—into a termination "due to a lack of work." Had plaintiff been taken off the payroll in March when he was dismissed from his position, as defendant could have done, he would have no argument that he was terminated "due to a lack of work." That the employer continued to pay him temporarily while he looked for another position does not change the nature of his dismissal.[7]

 Even if the plaintiff's interpretation were reasonable, however, he would still not prevail under the applicable standard of review. As noted, once the plaintiff has proposed a reasonable interpretation of the plan under which he would be covered, the burden then shifts to the defendant to prove that its interpretation was both reasonable and untainted by self-interest. *Nightingale*, 41 F.3d at 1483. The defendant can discharge its burden by showing that its wrong but reasonable interpretation benefits the class of all participants and beneficiaries, by proving that its interpretation was "calculated to maximize benefits to participants in a cost-efficient manner." *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d at 1552; *Brown*, 898 F.2d at 1566–67; *Newell*, 904 F.2d at 651.

For all the reasons discussed above, defendant's interpretation was certainly reasonable. Moreover, defendant has demonstrated that its interpretation was not tainted by self-interest. In the first place, plaintiff has a colorable argument that he was entitled to benefits only because defendant kept him on the payroll for eight months while he looked for another job. Defendant's decision to give plaintiff this eight months to look for a job was clearly intended to benefit plaintiff, not defendant.[8] Indeed, as noted, this eight month period was just two months short of the ten months of salary plaintiff would have received had he been qualified for the severance program. Nor is there any evidence indicating that DuPont was otherwise attempting to cut plaintiff's benefits in an effort to conserve company resources. Reviewing the communications between plaintiff and Bowditch, it appears that Bowditch made

---

7. Defendant characterizes this continuation of plaintiff on the payroll as a "generous gesture" and, to the extent that continued payments to plaintiff were not required legally, this characterization is accurate. Even though not legally required, however, some recognition of plaintiff's years of service appears to have been in order, inasmuch as plaintiff had worked for defendant for twenty years, rising to a high level position from which he had never before earned any unsatisfactory reviews, only to be discharged by the company for whom he had worked most of his adult life and with whom he expected to end his career. Indeed, plaintiff's most appealing argument, on a human level, is that he was discharged less from any tangible deficiencies than from a desire to change leadership at a time when sales results were not what defendant had hoped them to be: a phenomenon that a review of other cases before this Court suggests is not atypical in the tough, competitive business world that companies now face. (Mr. Wyatt noted that when the baseball team is doing poorly, the first response is sometimes to fire the manager). This case is not before the Court, however, on any review of the adequacy of the employer's reasons for discharging plaintiff, but instead merely on the correctness of its decision that plaintiff was not entitled to severance benefits under the terms of the CTFA plan.

8. The Court recognizes that plaintiff did perform some project work for DuPont during the initial five month period when he was searching for a job, so DuPont certainly received some benefit from retaining plaintiff on the payroll during that period. In addition, plaintiff also assisted in the transition process for the individual chosen to replace him. Nonetheless, the Court concludes that the predominate motivation in allowing plaintiff to remain on the payroll temporarily was to help plaintiff, not to advance DuPont's financial self-interest.

every effort to ensure that plaintiff received all benefits for which he was eligible. (*See, e.g.*, Def.Mot. for Sum.J. [19] at Ex. 15 (recapping discussion with Bowditch regarding outplacement benefits and exit benefits such as vacation pay and deferred pension).)

Most importantly, the Court concludes that refusing to permit plaintiff to recover CTFA benefits under these circumstances advances the interests of the class of plan participants. *See Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d at 1565–66. In an era of corporate downsizing, defendant set up a plan to award benefits to employees whose jobs it had eliminated or "excessed" and presumably anticipated an approximate amount of money that might be required to fund such a plan. Expanding the plan to cover those additional employees who were dismissed for performance reasons and then replaced with other employees would clearly expand the anticipated class to be covered and thereby could well cause DuPont either to contract sharply the benefits payable to each eligible employee or to discontinue the program altogether.[9] Indeed, it is understandable that an employer might not wish to create an incentive for unsatisfactory performance by offering a generous benefits package for employees who so performed and who were then discharged.

Accordingly, the Court concludes that defendant's motion for summary judgment is granted because defendant's decision to deny plaintiff benefit's under the CTFA plan was not arbitrary and capricious, under even the most "heightened" of standards.[10]

---

9. Under the terms of the CTFA plan, DuPont is permitted "to change or discontinue [the] Plan in its discretion." (Def.Mot. for Sum.J. [19] at Ex. 30.)

10. Defendant argues that plaintiff has no standing to assert any claim under the plan. The Court finds this argument without merit. As plaintiff points out, plaintiff has standing as he has a "colorable" claim to benefits. *See* 29 U.S.C. § 1132(a)(1) (allowing suit by participant in plan); *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 117–18, 109 S.Ct. 948, 957–58, 103 L.Ed.2d 80 (1989) (holding that participant includes former employees who have " 'a colorable claim' to vested benefits" (quoting *Kuntz v. Reese*,

## CONCLUSION

Accordingly, defendant's Motion for Summary Judgment [19] is **GRANTED**.

785 F.2d 1410, 1411 (9th Cir.), *cert. denied*, 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986))).

Defendant also argues that plaintiff's action is barred by the statute of limitations because it was filed more than two years after the determination by Bowditch in late March, 1993 that plaintiff would not be eligible for CTFA Plan benefits because he was being replaced as Regional Manager. While plaintiff does not dispute that the statute of limitations is two years, plaintiff contends that the relevant date for the calculation of the statute of limitations is November 30, 1993, the date that plaintiff ultimately left DuPont. As the Court has determined that plaintiff cannot otherwise prevail, it does not reach this additional defense proffered by defendant.