[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 25, 2000
THOMAS K. KAHN
CLERK

_____

No. 99-11734

_____

D.C. Docket No. 97-01251-CIV-ORL-19

JAMES F. ADAMS, WILLIAM W. ADAMS, et al.,

Plaintiffs-Appellants,

versus

THIOKOL CORPORATION, administrator of Thiokol Corporation Employee
Separation Pay Plan, RICHARD T. SMITH, as Administrator of Thiokol
Corporation Employee Separation Pay Plan, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(October 25, 2000)**

Before EDMONDSON, HULL and WOOD[*], Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

_____

[*]Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by
designation.

Plaintiffs, 301 former employees of Thiokol Corporation[1] ("Thiokol"), brought an action against Thiokol, the Thiokol Corporation Employee Separation Pay Plan (the "Plan"), and Richard T. Smith, Administrator of the Plan (collectively referred to as the "Defendants"), seeking severance pay pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. The district court granted Defendants' motion for summary judgment and dismissed Plaintiffs' claims. Plaintiffs timely filed this appeal. We affirm in part and reverse and remand in part the district court's order.

## I. BACKGROUND

From 1984 to 1995, Thiokol's Space Services division performed booster rocket and external fuel tank assembly and recovery for the space shuttle project at Kennedy Space Center under a subcontractor agreement with the general contractor, Lockheed Martin ("Lockheed"). On June 26, 1995, Lockheed notified Thiokol that as a result of a cost consolidation effort, it would not renew Thiokol's contract but would take over responsibility for the Space Services operations at the Space Center. However, Lockheed stated that it planned to fill all of the required

---

[1]Thiokol Corporation became Cordant Technologies, Inc. as a result of a name change in 1998.

positions with existing subcontractor personnel.[2]  Lockheed stated their intent was to offer equivalent compensation and the applicable Lockheed benefits package, while allowing the new employees to retain their site seniority.  After Lockheed announced the contract would not be renewed, Thiokol entered into negotiations with Lockheed to sell the operating assets of the Space Services division.  The transition was to be completed by September 30, 1995.

Plaintiffs were notified that they would need to submit an employment application, and were later required to interview with Lockheed and take a physical and a drug test in order to be hired.  Plaintiffs were employed by Thiokol until 12:00 a.m., September 30, 1995, and immediately went onto Lockheed's payroll at 12:01 a.m., October 1, 1995, with no break in service and at equal or greater pay rates.[3]  The contract for the sale of the assets was dated October 1, 1995, and signed by both parties on October 2, 1995.

Plaintiffs were all participants in Thiokol's Plan, a self-funded severance pay plan which is an employee welfare benefit plan as defined under § 3(1) of ERISA,

---

[2]There were approximately forty Thiokol employees who were not offered positions by Lockheed, who received separation pay and who are not part of this suit.

[3]Plaintiffs do not disagree that the actual pay rates were equal or greater.  However, they maintain that because they paid more for equivalent medical insurance coverage, received less vacation benefits (which were modified after the denial of separation benefits), and had their separation pay benefits reduced (from a maximum of twenty-six weeks at Thiokol to a maximum of four weeks at Lockheed), the resulting wages were equal or less.

3

29 U.S.C. § 1002(1).[4]  The Plan originated in 1992 and provided for benefits to be paid from Thiokol's general assets to employees who would involuntarily lose their jobs due to a reduction in work force ("RIF").  Master Plan, pp. 1, 4.  The language of the Plan excluded severance benefits for "[t]ermination of employment resulting from . . . (ii) the sale of all or part of the business assets of the Company or a subsidiary or a business unit; . . . or (iv) any other form of reorganization including a spinoff; and the employee is offered a position (whether or not such position is comparable to the prior position) by the acquiring or resulting company; . . . ."  Master Plan, General Exclusions, pg. 3(5).  The company reserved the right to amend or terminate the Plan at any time and "to modify or change the schedule of benefits . . . for any specific reduction in force or for any business unit or subsidiary of the Company if economic conditions or other business reasons warrant such change."  Master Plan, pp. 2, 4.  The Plan also designated a Plan Administrator as the person who was responsible for interpreting the terms of the Plan and who determined eligibility for benefits.

Pursuant to the modification clause in the Plan, in July 1995, a Separation

---

[4]29 U.S.C. § 1002(1) states in relevant part that an "employee welfare benefit plan" is "any plan, fund, or program . . . maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants . . . (A) . . . benefits in the event of . . . unemployment . . . ."  Thus, a severance pay plan is an "employee welfare benefit plan," as defined under ERISA.

4

Allowance Amendment (the "Amendment") was published for employees of Space Services (all of Plaintiffs herein) which raised the separation allowance benefits from sixteen weeks as designated in the original Plan to a maximum of twenty-six weeks and introduced the language of a "comparable position" in reference to accepting a position with a successor company in the case of a sale, merger or reorganization. However, the Amendment did not define "comparable." The Amendment stated that a separation allowance would **not** be paid for "[t]ermination resulting from any sale, merger or reorganization of the company, and the workteam member terminates rather than accept a comparable position." (emphasis added).

In addition, a "Questions and Answers" memo regarding the transition of the division to Lockheed was issued to Space Services employees in July 1995. This memo posed the question, "Will I receive any severance benefits from Thiokol if I accept a position from [Lockheed] as of October 1, 1995?" The answer was, "No." The memo also stated that an employee who was not offered a comparable job with Lockheed would receive severance benefits, and defined a comparable job as "one that is within 10% of your current pay or one that is more than your current pay." This memo also informed employees that anyone who did not submit a job application to Lockheed or who rejected a comparable job offer would be

5

considered as having voluntarily terminated and would not be eligible for any severance benefits.

After commencing employment with Lockheed, 305 former Thiokol employees made a request for separation pay under the Plan. All requests were denied. As required by the Plan, the employees first appealed to the Plan Administrator for review. The Administrator denied all but four of the claims. The remaining 301 employees brought this suit.

Due to the numerosity of plaintiffs and in the interest of judicial expediency, all parties agreed to bifurcate discovery into two phases, based on the expectation that the case could be wholly or partially resolved on cross motions for summary judgment. Phase One narrowed the focus to a review of the specific language in the Plan and to the decision made by Smith, as Administrator, in which he declined to pay separation benefits to the Plaintiffs. Phase Two, if necessary, would determine if the employment offered by Lockheed was "comparable" as defined by the Plan.

The district court granted Thiokol's motion for summary judgment and the Plaintiffs appeal. Plaintiffs argue that there was no "sale, merger or reorganization of the company," but maintain they were involved in the closing of the Space Services division and a subsequent RIF, which would be governed by Thiokol

6

policy statement, "Facility Closing and Reduction of Work Force." Plaintiffs assert that the terminations did not result from any sale because the sale of assets contract was not signed until after the employee changeover occurred.

Plaintiffs also claim that four of their number are owed separation pay as the situations of the four fall within Smith's stated criteria for awarding separation benefits. Plaintiffs assert that employees Granberry, Krengel, Reasoner, and Wylie, all of whom transferred to Lockheed with comparable positions, were laid off prior to completing one year of service with Lockheed and should have received separation pay as defined by Smith.

## II. STANDARD OF REVIEW

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court discussed the appropriate standard of review in 29 U.S.C. § 1132(a)(1)(B)[5] actions challenging a denial of benefits based on plan interpretations. A review under the arbitrary and capricious standard is appropriate where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch*, 489 U.S. at 115. However, "if a benefit plan gives discretion to an administrator or fiduciary who is

---

[5]29 U.S.C. § 1132(a)(1), provides that a "civil action may be brought . . . by a participant or beneficiary [of a covered plan] . . . (A) for the relief provided for in [§ 1132(c)], [or] (B) to recover benefits due to him under the terms of his plan."

7

operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (quoting RESTATEMENT (SECOND) OF TRUSTS § 187, Comment *d* (1959)). "[T]he beneficiary need only show that the fiduciary allowed himself to be placed in a position where his personal interest *might* conflict with the interest of the beneficiary." *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1565 (11th Cir. 1990) (quoting *Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 571 (5th Cir. 1966) (emphasis in original)). "A conflicted fiduciary may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries." *Id.* (citation omitted). The standard of review for a fiduciary operating under a conflict of interest remains arbitrary and capricious with a significantly diminished degree of deference. *Id.* at 1568. Although "[e]ven a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries," *id.*, "the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest." *Id.* at 1566. If the fiduciary succeeds in proving this burden, the opposing party "may still succeed if the action is arbitrary and capricious by other measures." *Id.* at 1568.

## III.  APPLICATION

8

## A.  Interpreting the Plan

The Thiokol Plan designates the Administrator, Smith, as the person who is responsible for interpreting the terms of the Plan and determining eligibility under the Plan.  The district court found that Smith was operating under a conflict of interest because he "was not only an employee of Thiokol, but was also an officer and stockholder."  This circuit has noted that ERISA does not prohibit an individual from "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest."  *Newell v. Prudential Ins. Co.*, 904 F.2d 644, 649 (11th Cir. 1990) (quoting 29 U.S.C. § 1108(c)(3) (West Supp. 1990)).  However, as we have noted, in reviewing factors such as self-interest as pertains to the legal standard for reviewing benefits determinations, "This task reaches the height of difficulty in a case . . . where an insurance company serves as the decisionmaking fiduciary for benefits that are paid out of the insurance company's assets."  *Brown*, 898 F.2d at 1561.

In the case of *Brown*, which dealt with a health insurance company, we held that "[b]ecause an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business."  *Id.*; *see also Newell*, 904 F.2d at 650 (citation omitted).  Similar circumstances arise in the present case.  Thiokol is a profit-

9

making business; the Plan provides that the payment of separation pay would be made from the general assets of the corporation; and the Administrator, a Thiokol employee, acknowledged that the cost could amount to millions of dollars. There is clearly a conflict of interest which requires a heightened scrutiny for abuse of discretion. *See Newell*, 904 F.2d at 651; *see also Brown*, 898 F.2d at 1569 ("Because Blue Cross profits from such forfeitures, we should demand strong justification for an interpretation which produces [a forfeiture] result.").

Under the heightened standard, we must first determine the legally correct interpretation of the disputed plan provision. *Brown*, 898 F.2d at 1570; *Newell*, 904 F.2d at 651. If the administrator's interpretation was legally correct, the inquiry ends. *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir. 1997). If the administrator's interpretation differs, we must then determine whether the administrator was arbitrary and capricious in employing a different interpretation. *Brown*, 898 F.2d at 1570; *Newell*, 904 F.2d at 651.

The original 1992 Plan document specifically excluded severance benefits for "[t]ermination of employment resulting from . . . (ii) the sale of all or part of the business assets of the Company or a subsidiary or a business unit; . . . or (iv) any other form of reorganization including a spinoff; and the employee is offered a position (whether or not such position is comparable to the prior position) by the

10

acquiring or resulting company; . . . ."  However, the July 1995 Amendment states

that a separation allowance will not be paid for termination "resulting from any

sale, merger or reorganization of the company and the workteam member

terminates rather than accept a comparable position."  The Amendment language

states that severance benefits will **not** be paid for an employee who terminates

when there is sale, merger or reorganization (while implying that there is no

restriction on severance benefits for an employee who accepts a comparable

position).[6]  (emphasis added).  This language contradicts the language in the 1992

Plan and creates an ambiguity.  The Amendment also conflicts with the

explanations set forth in the Questions and Answers memo.

ERISA requires that employee benefit plans be "established and maintained

pursuant to a written instrument."  29 U.S.C. § 1102(a)(1).  In addition, by

requiring that each plan specify the procedure for amending the plan, *id.* §

1102(b)(3), "Congress rejected the use of informal written agreements to modify

an ERISA plan."  *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986) (citing

*Johnson v. Central States, Southeast*

---

[6]Although we suspect the language of the Amendment was a simple misstatement-presuming that Thiokol intended to state no separation allowance would be paid for: "Termination resulting from any sale, merger or reorganization and the workteam member accepts a comparable position or terminates rather than accept a comparable position"-the ambiguity which arises from the conflicting language of the Plan and the Amendment must be addressed.

*and Southwest Areas Pension Funds*, 513 F.2d 1173, 1174-75 (10th Cir. 1975) (stating that benefits may not be enforced according to a company booklet and letter that are inconsistent with the terms of a written pension plan)).  Although the Amendment is a formal, written document as prescribed under ERISA, *see* 29 U.S.C. §§ 1102(a)(1), 1102(b)(3), which modified the Plan as allowed, its primary purpose was to raise the separation benefit amounts as pertains to the Space Services division.  In all other respects, it repeats the language of the Plan except for the one contradictory statement.[7]

Under the decisions of this court and the laws of Florida, where the meaning of a term is unclear or ambiguous, a reviewing court can consider extrinsic evidence to explain the ambiguity.  *See Stewart v. KHD Deutz of America, Corp.*, 980 F.2d 698, 702 (11th Cir. 1993); *Hurt v. Leatherby Ins. Co.*, 380 So.2d 432, 433 (Fla. 1980); *see also Vencor Hosp. South, Inc. v. Blue Cross and Blue Shield of Rhode Island*, 86 F.Supp.2d 1153, 1160 (S.D. Fla. 2000).  We find this also applies in determining ambiguous language in an ERISA plan such as the one in this case.  As the Supreme Court noted in *Bruch,* where the plan did not delegate discretionary or final authority to construe uncertain terms, the reviewing court

---

[7]The Questions and Answers memo is not controlling as it is simply an informal employee communication.  *See Nachwalter*, 850 F.2d at 960.

could "look[] to the terms of the plan and other manifestations of the parties' intent." 489 U.S. at 112-13 (citations omitted). Although Smith was delegated final authority, he also looked to "other manifestations of the parties' intent." While the Questions and Answers memo clearly supports the language of the Plan, Smith looked further in examining extrinsic evidence which would explain Thiokol's intent. As indicated in the record, he spoke with current and former Thiokol employees, who stated that the Plan was created to formalize Thiokol's prior administrative policies with regard to separation pay and to establish basic, uniform standards. The management policy memo which predated the 1992 Plan provided that separation benefits would not be paid in the case of a "[t]ermination as a result of any sale or transfer of business, in whole or in part, or in cases of merger, consolidation, or other reorganization where the individual is offered the opportunity to remain in the same or a substantially equivalent position with the new employer." Management Policy, Morton Thiokol, Inc. Aerospace Group Support Services, Separation Allowance, February 27, 1989. Smith also reviewed the employment and termination history of Thiokol and found that Thiokol had consistently denied separation pay to employees who were displaced and accepted comparable employment with a successor. *See Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir. 1985) ("The Plan was consistently interpreted because

13

in every other divestment situation where Ciba-Geigy employees were retained in their old positions by the purchasing entity, no severance pay was given."). All of the extrinsic evidence points to the fact that the language of the Plan policy, not the Amendment, is controlling.

The Plan language denies severance benefits where there is a sale of all or part of the business assets of a subsidiary or business unit of Thiokol or where there is a reorganization, and the employee is offered a position by the acquiring or resulting company. Thiokol sold the assets of the Space Services division to Lockheed, which then took over the division with all but approximately forty of the previous employees. Thiokol Space Services ceased to be an operating unit when Lockheed purchased a substantial portion of the Space Services assets and began operating the division as its own. Smith determined that the loss of the contract resulted in a reorganization of Thiokol because the Space Services division ceased to exist as a Thiokol division and an internal restructuring of Thiokol operations took place. Smith correctly interpreted the sale or reorganization language to apply to Thiokol "as a whole or to any subcomponent thereof."[8]

---

[8]Smith also took into account the fact that the transaction had been treated as a sale of substantially all of the assets of a separate trade or business under Thiokol's 401(k) plan, thus allowing Plaintiffs to receive distribution of their 401(k) plan accounts.

14

In making his initial determinations as to who might or might not be eligible for separation pay, Smith also reviewed the positions and pay of all of the Plaintiffs with respect to "comparability." Smith used a broader definition of comparability than "90% or more of an employee's Thiokol wages," as stated in the Questions and Answers memo, but took into account the wage amount, benefits, and job duties. He determined that 303 employees were employed by Lockheed at either the same or a higher initial base salary.

Smith also consulted two independent firms for advice. There is no requirement that an administrator who occupies the dual role of fiduciary and employee of the party in interest, such as Smith, must seek independent counsel in interpreting and administering an ERISA plan. *See Newell*, 904 F.2d at 650 (citing *Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan*, 854 F.2d 1516, 1531-32 (3rd Cir. 1988) (holding that a plan fiduciaries' reliance on in-house counsel to aid in interpreting and administering the plan, rather than hiring independent counsel, was not a violation of ERISA)).[9] Smith commissioned Towers Perrin, an international benefits consulting firm, to conduct an actuarial analysis of the two benefit programs. The principal of the firm reported that "there

---

[9]The Third Circuit notes that the only ERISA cases which require independent counsel have to do with the conduct of fiduciaries in connection with the investment and management of plan assets, an area in which ERISA fiduciaries are uniformly held to stricter standards. *Ashenbaugh*, 854 F.2d at 1532 (citations omitted).

15

is not a material difference in the actuarial value of the benefits provided by Thiokol Space Services and Lockheed Martin Space Operations." While Smith found the non-salary benefit programs to be somewhat different, he concluded that Thiokol's benefits and Lockheed's benefits were "comparable in the aggregate." We note the evenhandedness of Smith's decision-making process, as evidenced by Smith's extensive efforts to make informed and knowledgeable decisions, including input from two independent firms, in interpreting the Plan. While we do not address the merits of Smith's "comparable job" findings, this showing of evenhandedness is evidence of Smith's good faith efforts. *See Anderson*, 759 F.2d at 1522.

We find that Smith's decision was a fair and reasonable reading of the Plan language. *Id.* Notwithstanding the contradictory statement contained in the Amendment, the Plan clearly states no severance pay was to be awarded when there is a sale or reorganization and the employee accepts a comparable position with the new entity. *See Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1498 (11th Cir. 1987); *Anderson*, 759 F.2d at 1520 (holding that plan administrator's decision to deny severance benefits was not arbitrary or capricious when company's ERISA plan provided for an exception to severance pay provision). Contrary to Plaintiffs' assertion that this was a RIF, the record shows that Thiokol

16

acted as if this was a sale or reorganization, not a RIF. Lockheed and Thiokol informed Plaintiffs of the terms and conditions under which they would be transferred to Lockheed. Plaintiffs were placed on notice by the Questions and Answers memo, which stated that those employees accepting a comparable job would not receive severance benefits. *See Anderson*, 759 F.2d at 1522. Plaintiffs had a reliable document which explained the affect of his or her decision to accept a position with the new company in relationship to eligibility for severance benefits from the old company. *See Sharron v. Amalgamated Ins. Agency Services, Inc.*, 704 F.2d 562, 566-67 (11th Cir. 1983) (upholding denial of benefits where company distributed booklet which discussed the effect of breaks in service as to pension plan benefits and which contained hypothetical questions and answers and addressed plaintiff's specific situation).

One of the primary goals of an ERISA plan should be the protection of the employees' interests. *See Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983). However, an ERISA plan administrator is required to administer a plan "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions [of ERISA]." 29 U.S.C. § 1104(a)(1)(D). Smith noted the Plan's stated purpose was to "provide unemployment income assistance," and concluded that the employees who

transferred to Lockheed were not unemployed and did not experience a material loss of income. As Smith stated, "It is not the intent of the severance pay Plan to provide bonus payments to individuals who have experienced no income loss." *See Bradwell v. GAF Corp.*, 954 F.2d 799, 801 (2nd Cir. 1992).

In this case, we agree with the Eighth Circuit's holding in *Harper v. R.H. Macy & Co. Inc.*, which stated, "[W]hen terminated employees are immediately rehired by a departing [employer's] successor under terms that are comparable to those received from their initial employer, the employees are not entitled to severance benefits." 920 F.2d 544, 545-46 (8th Cir. 1990) (citations omitted). The Thiokol Plan anticipated and addressed this type of situation. *See Bradwell*, 954 F.2d at 800 ("By its plain language and evident intent, the Severance Pay Policy does not entitle appellants to recover."); *Headrick v. Rockwell Int'l. Corp.*, 24 F.3d 1272, 1276 (10th Cir. 1994). Any severance pay from Thiokol would have been the equivalent of a windfall recovery for the Plaintiffs, who never suffered a day of decreased pay or unemployment.[10]

As to Plaintiffs' assertion that the sale of assets did not occur until after the transition, Smith stated that he had been told of Lockheed's intent to purchase the

---

[10]This does not address those employees who are terminated but may then find alternate employment on their own. *See Bradwell*, 954 F.2d at 800.

division's assets and retain the personnel prior to July 1995 in order to prepare the severance pay communications given to the employees. The Lockheed letter and Special Report to Employees support this contention. An affidavit given by Thiokol's contracts manager also stated that Lockheed was contractually obligated to purchase the Space Services assets upon termination of the subcontract. Given the fact that negotiations regarding the sale of Space Services assets had been ongoing after Lockheed announced it would not renew Thiokol's employment contract, we do not find the fact that the sale of assets contract was signed on October 2, 1995 to be determinative.

Nothing in the record indicates Smith acted in anything other than good faith. *See Anderson*, 759 F.2d at 1522. Although he alone was given the authority to interpret the Plan, he requested an independent actuarial evaluation and solicited an independent review from an outside law firm. We find that Smith's interpretation was legally correct and therefore affirm this portion of the district court's finding of summary judgment.[11]

## B. Granberry, Krengel, Reasoner, and Wylie

---

[11]Plaintiffs argue that this court's decision in *Bedinghaus v. Modern Graphic Arts*, 15 F.3d 1027, 1032 (11th Cir. 1994), which awarded severance pay to employees from one company who were retained with a successive corporation, requires reversal of the district court's order. We disagree. The panel itself distinguished *Bedinghaus* in noting that the termination benefits policy had no exception to severance pay eligibility based on a sale or reorganization where the employees remained in comparable positions. 15 F.3d 1032.

We find, however, there is a dispute of material fact as to the Plaintiffs'
claim for severance benefits owing to Plaintiffs Granberry, Krengel, Reasoner, and
Wylie. In his deposition, Smith stated that he would consider awarding severance
pay to any employee who had accepted a comparable position, but who was then
terminated with less than a year of employment at Lockheed. Also in his
deposition, Smith discussed the fact that in one of his letters to Plaintiffs' counsel,
he requested information on any Thiokol employee who had been laid off by
Lockheed through December 1996. He stated that he would be willing to consider
severance benefits for any previous Thiokol employee who had been laid off or let
go from Lockheed prior to December 1996, provided there was no unusual
problem or provocation on the employee's part, such as violence.

Plaintiffs argue that Granberry, Krengel, Reasoner, and Wylie accepted
comparable positions with Lockheed but were terminated prior to one year's
employment. Notice of Granberry, Krengel, and Reasoner having been laid off on
May 31, 1996, May 1, 1996, and May 1996, respectively, was submitted in an
attachment to a letter dated February 26, 1997, from Plaintiffs' counsel to Smith.
There was no notice of Wylie having been laid off in that correspondence. In his
letter of March 31, 1997 to Plaintiffs' counsel, Smith acknowledges having
received information that Granberry and Krengel were laid off by Lockheed

20

between December 1995 and October 1, 1996. Defendants mistakenly argued that Plaintiffs' counsel never disclosed when Granberry and Krengel were terminated. In a follow-up letter to Smith dated April 25, 1997, Plaintiffs' counsel repeated that Granberry, Krengel, and Reasoner had been laid off, in addition to noting that Wylie had also been laid off by Lockheed in May of 1996.

While there is evidence in the record supporting Plaintiffs' assertions on this issue, we find no evidence that Smith individually addressed the situation of these four employees and no specific indication of the grounds on which he determined they were not eligible for severance benefits. In his letter of June 13, 1997, Smith stated he was awarding severance benefits to employees DeSantis and St. John based upon the premise that, because DeSantis was laid off by Lockheed in December 1995 and St. John's offer of employment was retracted in November 1995, the two "were not offered continued employment." Because Smith has stated he would, and did, consider eligibility for employees who were terminated from Lockheed prior to a year's employment, yet did not distinguish why these four employees who fell within his stated exception were denied benefits,[12] we

---

[12]Plaintiffs also argued this issue in their Motion for Summary Judgment. However, in their response, Defendants did not offer any further information to resolve Smith's apparent contradiction in stating that he would consider granting severance benefits to any employees who were terminated by Lockheed prior to December 1996 but why he did not do so in the case of these four employees. Nor did Defendants' appellate brief offer any specific information on this issue.

21

reverse the order of summary judgment as to these four Plaintiffs and remand this issue to the district court for further findings and a determination as to whether or not these four were exceptions under Smith's stated criteria and should or should not have received separation benefits.

## IV.  CONCLUSION

We affirm in part the district court's order of summary judgment denying Plaintiffs separation benefits and reverse and remand in part for further findings as to the four Plaintiffs who were terminated from Lockheed prior to one year's service with the company.

AFFIRMED in part; REVERSED and REMANDED in part.